**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**DARON CALDWELL,**

　　　　　　　　**Plaintiff(s),**　　　　**CASE NUMBER: 04-74998**
　　　　　　　　　　　　　　　　　　　　**HONORABLE VICTORIA A. ROBERTS**

**v.**

**CITY OF DETROIT, et al.,**

　　　　　　　　**Defendant(s).**
_____/

**ORDER**

**I.    INTRODUCTION**

This matter is before the Court on Defendants' Motion for Summary Judgment.
The Court **GRANTS** Defendants' motion **IN PART**.  Argument on the motion was held
on October 12, 2005.

**II.   BACKGROUND**

Plaintiff Daron Caldwell brings this action against the City of Detroit ("the City"),
Detroit Police Chief Ella Bully-Cummings, and seventeen Detroit Police officials and
officers (hereinafter "Defendants").[1]  This case arises from a shooting that took place on
June 23, 2004 in the City of Detroit during the Freedom Festival Fireworks.  At

_____

　　　[1]The other named officials and officers are: Deputy Chief Harold Cureton,
Commander Craig Swartz, Sergeant B. Higgins, and Officers Moises Jimenez, Derrick
Thomas, Kenneth Gardner, David Anderson, Darrell Jones, Keith Marshall, M.
Seagram, G. Przybyla, K. Miller, A. Johnson, Craig Stewart, Richard Swartz, D. Idine,
and D. Thomas.

1

approximately 10:15 p.m., someone fired a weapon near Hart Plaza in Downtown Detroit. Nine people were shot, one fatally. This victim, however, did not die until several months later.

The Detroit Police Department ("DPD") immediately launched an investigation. Defendants say that one of a number of tips that were called into the DPD included an anonymous tip that Plaintiff may have been involved in the shooting. Based on this tip, in the early evening on June 24, 2004, Officers Augustus Davis, Anthony Johnson ("A. Johnson"), Kenneth Johnson ("K. Johnson"), and Rufus Stewart, who were assigned to the DPD Violent Crime Task Force, obtained Plaintiff's address and surveilled his home. When Plaintiff left his house and drove away, the officers followed him to another location and stopped him after he parked and exited his car. However, of these officers, only A. Johnson is a party to this suit.

Plaintiff disputes that he consented to go with the officers to the police station for an interview. He says he was forcibly detained and taken into custody. However, Officer Davis says in the Preliminary Complaint Report ("PCR") attached to Defendants' motion, that Plaintiff did consent. But, Plaintiff points out that Officer Davis appears to have completed two different PCRs describing his initial encounter with Plaintiff. In the PCR initially given to Plaintiff during (state court) discovery (referred to for convenience as "PCR 1"): 1) Officer Davis identifies the report as one on an "arrest critical shooting;" 2) he states that Plaintiff was "investigated, arrested and conveyed to the homicide section (SAS) for processing;" and 3) at the beginning of the narrative, the letter "A" precedes Plaintiff's name. Plaintiff says this denotes "arrest." However, in the PCR attached to Defendants' motion ("PCR 2"), there is no mention of an arrest: 1) Officer

2

Davis refers to the report as one on "conveyance of subject;" 2) he says that Plaintiff was "investigated and consented to being conveyed to the homicide section (SAS) for an interview;" and 3) instead of Plaintiff's name after the letter "A," it says "none."

In addition to these discrepancies, Plaintiff points out that Officer Moises Jimenez, who was the Officer-in-Charge of the investigation, credited Officers Davis and A. Johnson with "making the arrest" of Plaintiff.  *See* Pl. Exh. D.

Further, the DPD uses a "Witness Transportation Consent Form."  *See* Pl. Exh. C, p. 6.  The Consent Form requires the signer to affirm that he agreed to go to the station for an interview and that he understands, *inter alia*, that he is not under arrest and that he can stop the interview at any time.  Plaintiff says that he never executed such a form.  In contrast, another suspect who was brought in for questioning on the same date, Kenneth Kendrick, was presented with such a form and did sign it.

Three witnesses positively identified Plaintiff that evening at the station.  Two witnesses, Aaron Edmondson and Christopher Thackaberry, participated in a photograph "show-up."  The show-up was conducted by Officer Jimenez.  He showed Edmondson and Thackaberry six photographs, one of which was Plaintiff's. Edmondson unequivocally identified Plaintiff as the shooter.  Thackaberry identified him as well, but commented that it was dark: "I would say its #2 [Plaintiff], but it was dark, but that would be him, he was backing away."  Def. Exh. D.  Officer Jimenez also conducted a line-up for the third witness, Doria Jackson.  During the line-up, Plaintiff was among five other men.  Ms. Jackson positively identified Plaintiff as present at the fireworks.  She later testified that she did not see Plaintiff fire a weapon, but at the line-up she said that she saw a gun laying on the ground near Plaintiff after he stood up:

3

"When he got up off the ground, I saw the gun where he was laying and he ran." *Id.*

DPD's investigation also included interviews with a number of other witnesses who gave varying descriptions of the shooter. Officer Jimenez summarized the information gathered, including the three positive identifications, in an "Investigator's Report/Warrant Request." He submitted this to the Wayne County Prosecutor's Office on the same evening that Plaintiff was picked up. Defendants say the Report included all of the witnesses known to Officer Jimenez at the time. And, they say the DPD Homicide file, which included all of the witness statements, was also made available to the prosecution.

A warrant for Plaintiff's arrest issued that evening. Plaintiff was then formally arrested and charged with: 1) nine counts of assault with intent to commit murder; 3) one count of felon in possession of firearm; and 3) one count of felony firearm. Approximately two weeks later, on July 7, 2004, a preliminary examination was held on the charges at the Thirty-Sixth District Court, before the Honorable Judge Miriam B. Martin-Clark. Prior to the start of the exam, Plaintiff's counsel (counsel in this matter as well) informed the Court that he only had a limited time to review the discovery he was given and that he had not been able to interview witnesses. He requested an adjournment. The court denied the request.

The prosecution called eight witnesses, including Mr. Thackaberry and Ms. Jackson. Over the prosecution's objection, Plaintiff was permitted to call one witness whom the prosecution subpoenaed but elected not to call. Ms. Jackson testified consistent with the statement she made at the line-up. However, Mr. Thackaberry said that he could not be 100% sure that Plaintiff was the shooter, but that Plaintiff closely

4

resembled the person he believed committed the crime.  At the conclusion of the

hearing, Judge Martin-Clark bound Plaintiff over for trial.  She found that there was

probable cause to believe that the alleged crimes were committed by Plaintiff.  It

appears from the transcript that Judge Martin-Clark only bound Plaintiff over on six

counts of assault with intent to commit murder and one count of felon in possession of a

firearm.  Def. Exh. F at p. 198.  Sometime thereafter, however, one victim died.  Then,

one assault count was amended to second degree murder.

In her ruling, Judge Martin-Clark acknowledged that some witnesses could not

positively identify Plaintiff and that there were discrepancies in the descriptions.  But,

she said that she was ultimately persuaded by the circumstantial evidence and the

testimony of Ms. Jackson and Mr. Thackaberry:

> The Court . . . acknowledges several witnesses were not clear about
> whom they saw or whether they saw anyone.  And, there was som
> [sic] inconsistent testimony regarding whether Mr. Cadwell [sic] was
> that person.  That is[,] some of the witnesses acknowledge he was
> and some said that he was not. . . . The Court is persuaded by the
> fact that at least two witnesses positively identified Mr. Cadwell [sic]
> as the shooter.  There were two witnesses who indicated he was not
> the shooter. . . . [I]t's a puzzle of circumstantial evidence, that the
> People have the burden of proving beyond a reasonable doubt at the
> next stage of the proceeding.

Def. Exh. F at p. 197-198.

After the preliminary exam, Plaintiff filed several motions including a "Motion to

Remand for Preliminary Examination and Compel Production of Witnesses and Reopen

Cross-Examination" and a "Motion to Quash."  In the Motion to Quash, Plaintiff argued

that the district court abused its discretion in binding him over because the evidence did

not support a finding of probable cause.  However, on October 4, 2004, prior to

5

argument on the motions, Wayne County Prosecutor Kym L. Worthy moved to dismiss the charges against Plaintiff without prejudice. In a press release, Ms. Worthy indicated that forensic evidence received on October 1, 2004 indicated that Plaintiff's DNA did not match any of the physical evidence at the scene of the shooting. There was also evidence that two weapons were used. Nevertheless, Ms. Worthy stated that the evidence referenced did not "eliminate Mr. Caldwell's participation in the shootings, or his known presence at that crime scene." Def. Exh. G.

This action seeks damages for what Plaintiff says was an unlawful arrest and prosecution. He denies even being in Hart Plaza on the night of the shooting. He contends that Defendants did not have credible evidence of his involvement. In fact, he asserts that the evidence gathered actually bolstered his claim of innocence. He says that anonymous tipsters identified seven other individuals. He also points out that a number of eyewitnesses gave detailed descriptions of the shooter that are inconsistent in several respects with his physical appearance on that night. Plaintiff says that he was 32 years old, 5'10", 190 pounds, clean-shaven with short hair and a medium complexion. However, several witnesses[2] described an individual who was younger, taller, had facial hair, was dark complected, and had an afro or braids. Mr. Thackaberry, in particular, described the shooter as "dark skinned" and "skinny."

Plaintiff further contends that Officer Jimenez failed to fully investigate other viable leads and omitted material information from his Investigator's Report. For example, one witness who was shot, Brandon Patterson, identified two other witnesses

---

[2]The witnesses were: Saana Dunnigan; Dominic Kennedy; Selena Greeley; Stacey Harman; Aaron Frederick Williams; Amber Adamick; and, Brandon Patterson.

who could possibly identify the shooter.  Patterson said that his friend, Pierre, hit a "light skinned" black male whose friend then began shooting.  Patterson also said that his other friend, Matthew, might know the shooter's name.  However, Plaintiff says that there is no record that DPD ever interviewed either witness.  Plaintiff further alleges that Officer Jimenez's Report includes a number of misleading statements and omissions with regard to witness statements.  For instance, Officer Jimenez said that witness Brandon Patterson described Plaintiff.  However, Mr. Patterson actually only said that the shooter was a dark-skinned, black male wearing a black shirt.  Officer Jimenez also said that witness Doria Jackson observed Plaintiff shooting a gun.  However, the notes of the line-up are silent as to whether Jackson saw anyone shooting a gun.

Lastly, Officer Jimenez did not include the fact that witness Frederick Williams said the shooter was wearing braids.  Plaintiff also asserts that Officer Jimenez's report did not include: 1) all of the names of the witnesses (although he does not indicate what names were left out); 2) the tips to the police (presumably, Plaintiff is referring to the anonymous tips identifying others besides himself); and 3) the fact that several eyewitnesses said that Plaintiff was not the shooter.

In what Plaintiff says was a deliberate attempt to influence the prosecution to charge and prosecute him, Plaintiff asserts that Jimenez's investigation was flawed and incomplete in a number of other respects.  He says Officer Jimenez: 1) failed to ask additional witnesses to participate in a photo show-up or a line-up, although more than ten eyewitnesses claimed to have seen the shooter; 2) made no immediate effort to compare Plaintiff's DNA with physical evidence recovered from the scene; 3) ignored every eyewitness who gave a physical description that did not match Plaintiff's

7

appearance, but instead relied on the composite description of two witnesses, Stacey Harman and Doria Jackson; 4) improperly influenced other witnesses by showing them Harman and Jackson's composite description; 5) failed to investigate other suspects named by tipsters; 6) ignored numerous witnesses who said Plaintiff was not the shooter; 7) failed to investigate or advise the court, prosecutor or Plaintiff's counsel about several witnesses who contacted the DPD after seeing Plaintiff on television at his arraignment (held prior to the preliminary exam) who claimed to be eyewitnesses or to otherwise have knowledge that Plaintiff was not the shooter; and 8) misrepresented that certain witnesses were not able to identify Plaintiff, when in reality they actually stated that someone else was the shooter.

In support of this last assertion, Plaintiff cites Officer Jimenez's reference in his report to Dominic Kennedy and Saana Dunnigan. For Kennedy, Officer Jimenez simply directed the reader to see her statement. In her statement, Kennedy describes a bald, black male with a mustache-goatee. For Dunnigan, Officer Jimenez stated that she provided a description of an unknown male shooting at the scene. However, he did not indicate that she described the shooter as 18 to 23 years old.

Lastly, Plaintiff contends that the DPD and Officer Jimenez's failure to come forth with exculpatory evidence prohibited Plaintiff from fully and fairly challenging the state court decision to bind him over for trial, and misled the court regarding the strength of the case against him. Specifically, Plaintiff complains that: 1) DPD and Officer Jimenez withheld from his counsel and the prosecution, statements of witnesses who gave descriptions of the shooter that did not match Plaintiff (Plaintiff presumably is referring to witnesses who gave statements on June 26, 2004: Ameer Spinks; Derrick Ingram;

8

Quintell McCullough; and, Raemon Smith. Pl. Exh. K.); 2) he did not receive discovery until the day before the preliminary exam, and the addresses and phone numbers of victims and eyewitnesses were redacted, thereby depriving his counsel the opportunity to talk to witnesses before the exam; and 3) he did not receive the statements of witnesses who maintained that he was not the shooter until after the exam, on August 19, 2004. Plaintiff also asserts that Defendant Officer Thomas filed a false police report claiming that Plaintiff admitted to firing a weapon on the night of the fireworks. Notably, however, the alleged confession was not referenced in Officer Jimenez's report or presented at the preliminary exam.

Defendants refute Plaintiff's claims. They say that: 1) the witnesses whose statements Plaintiff says were withheld, did not give statements until two days after Officer Jimenez prepared his report; 2) Plaintiff was given the statements of the witnesses who testified at the preliminary exam and he had an opportunity to cross-examine them at the exam, which is all Defendants say that the law requires (although Defendants do not cite the law to which they refer); 3) Plaintiff does not specifically identify which witness statements (from persons who said he was not the shooter) he claims were withheld; and 4) probable cause would have been established in any event.

Plaintiff attributes the alleged failings in Officer Jimenez's investigation to insufficient supervision and training. He says Defendants Schwartz (Commander), Cureton (Deputy Chief) and Bully-Cummings (Chief of Police) acted in accordance with the City's custom, policy and practice of 1) "not engaging in any systematic supervision or review of detectives or their investigations," and 2) "allowing detectives to investigate crimes, make arrests, prepare reports and handle evidence without appropriate

supervision." Pl. br. at pp. 5, 29. In support of his assertion, Plaintiff points out that the City entered into two Consent Judgments with the United States Department of Justice ("DOJ") on July 18, 2003. Defendants assert that the Consent Judgments are not relevant to this case, because they address issues which are not pertinent: use of force and conditions of confinement.

On the contrary, however, Plaintiff presented evidence which indicates that the Consent Judgments are not that limited. Additionally, the DPD was ordered to revise and monitor its arrest policies to prohibit arrests without probable cause, and to require supervisors to make significant changes to the policies, practices and procedures related to arrests and investigatory stops. The City was also to develop auditable forms to document violations.

But in a report issued on October 18, 2004, the Independent Monitor, Sheryl Robinson, found that, as of the quarter ending May 31, 2004, the City had not revised its arrest policy. Paragraph U42 of the Consent Judgment required the DPD to "define arrest and probable cause as those terms are defined in the Consent Judgment and prohibit the arrest of an individual with less than probable cause." Def. Exh. H at pp. 14, 17. In a subsequent review dated January 18, 2005, the DPD still had not fully complied with the requirements, but a finding of non-compliance was held in abeyance because DPD advised the Monitor that it planned to challenge the definition of probable cause.

As of May 31, 2004, the DPD was also not in compliance with paragraph U43, which requires review of all arrests:

> [T]he DPD [is] to review the merits of each arrest and opine as to

10

whether or not adequate probable cause existed to support the
arrest.  The review must be made at the time an arrestee is
presented at the precinct or specialized unit and memorialized within
12 hours of the arrest for those arrests in which adequate probable
cause does not exist, or for which the DPD does not request a
warrant, the DPD is required to generate an auditable form
memorializing such circumstances within 12 hours of the event.

Def. Exh. H at p. 18.  The January 18, 2005 report indicated that the DPD still had not

finalized and disseminated an auditable form which addressed the requirements of

paragraph U43.  *Id.*

Evidence presented by Plaintiff shows that the Consent Judgments also required

the DPD to provide annual training to recruits, officers and supervisors regarding, *inter

alia*, arrests and probable cause determinations:

Paragraph U114 requires the DPD to provide all DPD recruits,
officers and supervisors with annual training on arrests and other
police-citizen interactions.  Such training must include and address
the following topics:

a.    the DPD arrest, investigatory stop and frisk and witness
identification and questioning policies;

b.    the Fourth Amendment and other constitutional requirements,
including: advising officers that the "possibility" that an
individual committed a crime does not rise to the level of
probable cause; advising officers that the duration and scope
of the police-citizen interaction determines whether an arrest
occurred, not the officer's subjective, intent or belief that he or
she affected an arrest; and advising officers that every
detention is a seizure, every seizure requires reasonable
suspicion or probable cause and there is no legally authorized
seizure apart from a "Terry stop" and an arrest; and

c.    examples of scenarios faced by DPD officers and interactive
exercises that illustrate proper police-community interactions,
including scenarios which distinguish an investigatory stop
from an arrest by the scope and duration of the police
interaction; between probable cause, reasonable suspicion
and mere speculation; and voluntary consent from mere

11

acquiescence to police authority.

*Id* at p. 66.  In her January 18, 2005 report, the Monitor reported that the DPD was not yet in compliance with the training requirements of U114.

In sum, Plaintiff contends that his arrest was a result of Defendants' inaccuracies, misrepresentations and fraud.  His Complaint alleges:

> Count I--false arrest
>
> Count II--false imprisonment
>
> Count III--gross negligence
>
> Count IV--defamation
>
> Count V--conspiracy to violate state and federal law in violation of 42 U.S.C. §1983
>
> Count VI--malicious prosecution
>
> Count VII--constitutional violations for illegal search under 42 U.S.C. §1983 and state law as to Defendant Police Officers
>
> Count VIII--constitutional violations for the illegal act of fabricating evidence under 42 U.S.C. §1983 and state law as to Defendant Police Officers
>
> Count IX--constitutional violations for the illegal act of defamation of character under 42 U.S.C. §1983 and state law as to Defendant Police Officers
>
> Count X--constitutional violations under 42 U.S.C. §1983 as to Defendant City of Detroit.

Defendants request summary judgment on all Counts.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d

13

at 150.  The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

**IV.    ANALYSIS**

**A.    Clarification of Claims and Parties**

There are preliminary matters which the Court must address before turning to the merits.

**i.    Presumed Waiver of Claims**

Although Defendants requested summary judgment on each count of Plaintiff's Complaint, Plaintiff only addressed: 1) state claims for false arrest and imprisonment (Counts I and II) and malicious prosecution (Count VI); 2) a 42 U.S.C. §1983 claim for illegal arrest in violation of Plaintiff's Fourth Amendment rights (Count VII); and 3) municipal liability for failure to train and supervise (Count X).

Plaintiff also asserted in his brief that his Fourteenth Amendment Due Process rights were violated when he was illegally arrested.  However, this claim is not clearly alleged in the Complaint.  And, to the extent it is alleged, the Court presumes that Plaintiff abandoned the claim since he does not indicate whether he is asserting a violation of procedural or substantive due process (or both), and he does not cite authority or offer specific argument in support.

The only named Defendants against whom allegations are specifically made in

14

relation to these claims are Officers Jimenez, A. Johnson and Derrick Thomas[3] and the City of Detroit.

Plaintiff asserted at oral argument that Defendants' motion is premature because he has not had an opportunity to conduct discovery to determine the extent of the other named Defendants' involvement. However, the Sixth Circuit has settled this issue: a district court may not delay in deciding whether officers are entitled to qualified immunity if the defense is properly raised prior to discovery. *Summers v Leis*, 368 F.3d 881, 886 (6th Cir. 2004). "The purpose of a qualified immunity defense is not only protection from civil damages but protection from the rigors of litigation itself, including the potential disruptiveness of discovery." *Id.* If Plaintiff was unable absent discovery to adequately respond to summary judgment as to each of the named Defendants, it was incumbent upon him to file an affidavit pursuant to FRCP 56(f)[4] detailing the need for postponement and discovery. *See Abercrombie & Fitch Stores, Inc. v American Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002) ("The non-movant bears the obligation to inform the district court of its need for discovery[.] . . . Thus, before a summary judgment motion is decided, the non-movant must file an affidavit pursuant to Fed. R. Civ. P. 56(f) that details the discovery needed, or file a motion for additional

---

[3]It appears from a report filed by Officer Thomas that the proper spelling of his first name is "Derryck." *See* Pl. Exh. L. However, to maintain consistency, the Court will continue to use the spelling used in Plaintiff's Complaint and the case caption.

[4]FRCP 56(f) states:

When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

discovery."); *Emmons v McLaughlin,* 874 F.2d 351, 356-357 (6th Cir. 1989)(*quoting*

*Willmer Poultry Co. v Morton-Norwich Products, Inc.*, 520 F.2d 289, 297 (8th Cir. 1975))

(A party seeking to invoke the protections of FRCP 56(f) must "affirmatively

demonstrat[e] why he cannot respond to a movant's affidavits as otherwise required by

Rule 56(e) and how postponement of a ruling on the motion will enable him, by

discovery or other means, to rebut the movant's showing of the absence of a genuine

issue of fact.").

Since Plaintiff did not file the requisite affidavit or otherwise convey his need for

additional discovery with adequate specificity, the Court presumes that Plaintiff

abandoned the claims in Counts III, IV, V, VIII and IX, and the parties against whom

specific allegations are not made.[5] These claims and parties will be dismissed.

The claims that the Court will thus address are:

Count I -- false arrest (Defendants named:  A. Johnson, Jimenez and Thomas);

Count II -- false imprisonment (Defendants named:  A. Johnson, Jimenez and Thomas);

Count VI -- malicious prosecution (Defendants named:  A. Johnson, Jimenez and Thomas);

Count VII -- Fourth Amendment violation under 42 U.S.C. §1983 (Defendants named:  A. Johnson, Jimenez and Thomas);

---

[5]Chief Ella Bully-Cummings, Deputy Chief Harold Cureton, Commander Craig Swartz, Sergeant B. Higgins, and Officers Kenneth Gardner, David Anderson, Darrell Jones, Keith Marshall, M. Seagram, G. Przybyla, K. Miller, Craig Stewart, Richard Swartz, D. Idine, and D. Thomas (assuming that D.Thomas is a different individual than Derrick Thomas).

16

Count X -- municipal liability (Defendant named: City of Detroit)

### ii.      Amendment of Complaint

Plaintiff's claim of illegal arrest in violation of §1983 is not clearly alleged in the Complaint.  However, in other paragraphs of his Complaint - but not as part of Count VII - Plaintiff alleges arrest/seizure/incarceration without probable cause: (Paragraph 59: "illegally arrested and seized"; Paragraph 60: "no probable cause for Plaintiff to be arrested and/or incarcerated"; Paragraph 65: "false incarceration"; Paragraph 69: "no probable cause for Plaintiff to be arrested and/or incarcerated"; Paragraph 85 (a): "Violating Daron Caldwell's State and Federal Constitutional Rights to be free from illegal search and seizures, to be free from unreasonable arrest."  Count X: City of Detroit policies/practices of arresting without probable cause.)

 In Count VII, Plaintiff only asserts that he was deprived of his right to be free from invasion of privacy when his home was searched.  In his brief, Plaintiff argues that his allegedly illegal arrest deprived him of his Fourth Amendment right against unreasonable search and seizure.  *See* Pl. br. at pp. i.  And, he stated at oral argument that his Count I false arrest, was intended to complain of two arrests without probable cause: the warrantless arrest on the street and a subsequent arrest at the station. Counsel's argument became more focused later in the hearing:

> It appears our arguments are centered on the illegal arrest which subsequently led to the lineup which subsequently led to the identification that ultimately led to Mr. Caldwell being [arrested] without question.

Oral Argument Tr. at p. 29.

17

In their motion for summary judgment, their Reply brief, and, at hearing, Defendants contended that Plaintiff consented to be conveyed to the station and that he was subsequently arrested on probable cause.  Presumably then, they understood that Plaintiff challenged his arrest as a violation of the Fourth Amendment and §1983.  Under these circumstances ("leave [to amend] shall be freely given when justice so requires."  FRCP 15(a)), the Court will allow, and will require, Plaintiff to amend his Complaint to make clear his §1983 arrest without probable cause claim (initial detention and formal arrest).

### B.    42 U.S.C. §1983

Presuming this amendment, Plaintiff asserts that he was deprived of his Fourth Amendment rights, in violation of §1983, when he was arrested without probable cause.  42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"To state a cause of action under §1983, a plaintiff must allege the deprivation of a right secured by the United States Constitution or a federal statute by a person who was acting under color of state law."  *Spadafore v Gardner*, 330 F.3d 849, 852 (6th Cir. 2003).  The Defendant Officers do not dispute that they were acting under color of law or that Plaintiff alleges that his Fourth Amendment rights were violated.  However, they assert that there is no evidence to support a constitutional violation.  Alternatively, they

18

contend that they are entitled to qualified immunity.

Qualified immunity protects government officials who perform discretionary functions from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In other words, qualified immunity is appropriate either on the basis that the right allegedly violated was not at the time clearly established, or, if clearly established, was one that a reasonable person in the defendant's position could have failed to appreciate would be violated by his conduct. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Court will first consider whether Plaintiff established the asserted constitutional violation.

### i.     Illegal Arrest Without Probable Cause

Plaintiff's counsel made clear during oral argument that he asserts he was subjected to an illegal arrest at two junctures: 1) when he was initially taken to the police station for questioning, and 2) when he was formally arrested after the issuance of an arrest warrant. He contends that each arrest violated his Fourth Amendment right to be free from unreasonable seizures.

### a.     Plaintiff's Initial Detention

Defendant Johnson contends that Plaintiff is collaterally estopped from arguing that he was initially detained without probable cause, since he failed to raise this claim

19

at the preliminary examination or request a *Franks*[6] hearing prior to the exam.

When deciding the preclusive effect of a prior state court action, federal courts must look to state law.  *Darrah v City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001). Under Michigan law, collateral estoppel only applies when:

> 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Darrah,* 255 F.3d at 311 (citing *People v Gates,* 434 Mich. 146 (1990)).   The legality of Plaintiff's initial detention was not at issue during the preliminary examination.  The testimony focused exclusively on whether there was probable cause to believe that Plaintiff was the perpetrator of the shooting at Hart Plaza.  None of the arresting officers was even called to testify.  Consequently, this issue was not actually litigated or determined in state court.  Since the third element for collateral estoppel application has not been met, Plaintiff is not precluded from challenging the legality of his initial detention.

And, contrary to Defendants' assertion, the Court is not aware of any authority indicating that Plaintiff could have, or was obligated to, request a *Franks* hearing at or before the preliminary examination stage of the proceedings.  In fact, it appears that such a hearing would not have been an appropriate means of challenging probable cause, because *Franks* hearings are held for the purpose of assessing the veracity of

---

[6]*Franks v Delaware*, 438 U.S. 154 (1978).

20

assertions made by law enforcement officers to obtain a warrant:

> In *Franks,* the Court held that a party may only challenge the veracity
> of an affidavit if that party can make a "substantial preliminary
> showing that a false statement knowingly and intentionally or with
> reckless disregard for the truth, was included by the affiant in the
> warrant affidavit," and that the allegedly false statement was
> necessary for a finding of probable cause.  The inquiry does not
> continue if the court finds that the exclusion of the allegedly false
> statement does not result in a lack of probable cause. If the party
> succeeds in meeting this burden, the party is entitled to a hearing to
> determine if a preponderance of the evidence supports the
> allegations of lack of veracity.

*Mays v City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998)(internal citations omitted).

### b.   There is a Question of Fact Regarding Whether Plaintiff's Initial Detention Violated the Fourth Amendment.

A violation of the Fourth Amendment is committed when an officer takes a suspect from a place where he has a right to be to a police precinct for investigative purposes, without consent, probable cause or a warrant.  *Hayes v Florida*, 470 U.S. 811, 816 (1985).  The *Hayes* Court reasoned that "such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause."  *Id.*

The parties dispute whether Plaintiff's initial encounter with Officer Johnson and his companion officers (who are not named Defendants) is properly characterized as an arrest.  Officer Johnson did not have a warrant then.  At oral argument, defense counsel stated that Defendants agree there was no basis for a warrantless arrest of Plaintiff on the afternoon of June 24, 2004.  *See* Transcript at p. 42.  However, Officer Johnson

21

asserts in his brief (but not by affidavit) that Plaintiff consented to be questioned at the police station and to participate in a photo show-up and live line-up.  At oral argument, defense counsel asserted that, in fact, Plaintiff was free to leave.  *See* Transcript at p. 26.

Plaintiff denies that he gave consent to: 1) transport to the police station; 2) being photographed; or 3) a lineup.  Plaintiff failed to provide an affidavit in support of his assertions.  He did, however, present other evidence which suggests that he was forcibly detained without consent: 1) Officer Davis prepared conflicting PCRs, one of which states that Plaintiff was arrested; 2) Officer Jimenez credited Officers Johnson and Davis with arresting Plaintiff; and 3) there is no evidence that Plaintiff signed a consent form like the one executed by another suspect who was picked up and questioned on the same day.  These factors are sufficient to raise a question of fact concerning the legality of Plaintiff's initial detention.

Defendant Johnson's motion for summary judgment with respect to whether Plaintiff's initial detention violated the Fourth Amendment is denied.  Until the constitutionality of Defendant's actions is determined, the Court cannot address the issue of qualified immunity.  *See Gardenhire v Schubert,* 205 F.3d 303,311 (6th Cir. 2000)("[S]ummary judgment would not be appropriate if there is a factual dispute (i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.").

To the extent this claim is also asserted against Officers Jimenez and Thomas,

22

their motion is granted because there is no evidence that they participated in Plaintiff's initial detention.

### c. There is a Question of Fact Regarding Whether Plaintiff's Formal Arrest Violated the Fourth Amendment.

The Court presumes that Plaintiff's claim that Defendants did not have probable cause to formally arrest him is only alleged against Defendant Jimenez, since no allegations are made against Defendants Johnson and Thomas.  The Court finds that Plaintiff's claim cannot be resolved until the finder of fact determines whether his initial detention was an unlawful arrest.  Although inartfully pled, Plaintiff asserts a Fourth Amendment §1983 claim that he was unreasonably seized.  After this seizure, he was subjected to a photo show-up and line-up, providing the DPD officers with the only probable cause to seek an arrest warrant, *i.e.,* the three positive identifications.  The question becomes, viewing the evidence in the light most favorable to Plaintiff: 1) whether Plaintiff was unlawfully arrested when he was initially brought to the station; and, if he was 2) whether it was then a violation of his Fourth Amendment right to subject him to a line-up and show-up?

The finder of fact must first determine whether Plaintiff was under arrest when he was brought to the station.  If the finder of fact decides that Plaintiff voluntarily accompanied the police to the station and agreed to the line-up and show-up, none of his Fourth Amendment rights was violated, and the immunity question need not be addressed.  On the other hand, if Plaintiff was under arrest (and the Defendants have conceded such an arrest would have been without probable cause), whether Defendant

23

Jimenez is entitled to qualified immunity will turn on whether it was clearly established in 2004 that an unlawfully arrested subject could not be further seized and placed in a line-up and show-up, such that a reasonable person in Jimenez' position would have understood that such action was in violation of Plaintiff's Fourth Amendment rights.  If the right was clearly established, Jimenez would not be entitled to qualified immunity.  On the other hand, if the right was not clearly established, Jimenez would be entitled to qualified immunity.  The Court will reserve on the question of immunity until underlying facts are determined.

Notwithstanding the above, Defendants again argue that Plaintiff is estopped from challenging probable cause for his formal arrest because the issue was decided against him by the state court.

Defendant is correct that a finding of probable cause during state court criminal proceedings, typically estops a plaintiff from basing subsequent civil claims on lack of probable cause.  *Hinchman v Moore*, 312 F.3d 198, 202 (6th Cir. 2002).  "[W]here the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent §1983 action."  *Coogan v City of Wixom,* 820 F.2d 170, 175 (6th Cir. 1987), *overruled on other grounds by*, *Frantz v Village of Bradford*, 245 F.3d 869 (6th Cir. 2001).

However, like Plaintiff's initial detention, the Court finds that the issue raised in this case was not actually litigated in state court.  Plaintiff raises the question of whether there was probable cause for the issuance of an arrest warrant against him, in light of

24

the fact that the only incriminating evidence, *i.e.,* the positive line-up and show-up identifications, was obtained during an allegedly unlawful arrest.  *See Darrah*, 255 F.3d at 311 (finding that state court determination of probable cause at the preliminary hearing was not identical to the issue raised by plaintiff--whether the officer made a materially false statement upon which the state court relied to find probable cause). This question was not before the magistrate, and Defendants have not shown that Plaintiff could have raised it at, or prior to, the preliminary examination.  Therefore, collateral estoppel is not a bar.

Based on the foregoing, Defendant Jimenez's motion for summary judgment on Plaintiff's formal arrest is denied as well.

### C.    State Law Claims

In his Complaint, Plaintiff alleges tort claims against the officers and supervisory officials, as well as the City of Detroit.  All of the supervisory officials have been dismissed.  Also, it is settled Michigan law that the City of Detroit may not be held vicariously liable for the tortious acts of police officers, which were committed while the officers were engaged in their duties as law enforcement officers.  *Washington v Starke*, 173 Mich. App. 230, 241 (1988).  Therefore, the Court considers these claims against the remaining officers only: A. Johnson, Jimenez and Thomas.

### i.    False Arrest and Imprisonment

A false arrest or imprisonment is an arrest or imprisonment:

 (1) of a person
 (2) who is innocent of the charge on which he is arrested

25

(3) by the defendant or at his instigation

(4) without legal justification.

*Lewis v Farmer Jack Div., Inc*, 415 Mich. 212, 232 (1982).  As discussed above, there is a question of fact concerning Plaintiff's initial detention.  It is disputed whether Plaintiff agreed to go with the officers and participate in the investigation.  Therefore, Defendant Johnson's motion for summary judgment on these claims, as they pertain to the initial detention, is denied.  Since there are no allegations that Officers Jimenez and Thomas participated in his initial detention, and there is no evidence that they participated in detaining him once he was brought to the precinct, their motion for summary judgment is granted.

There is also a question of fact concerning Plaintiff's formal arrest.  As stated, whether there was probable cause for the issuance of an arrest warrant turns upon disputed questions of fact.  Therefore, Defendant Jimenez's motion for summary judgment on these claims, as they pertain to the formal arrest, is denied.  Plaintiff does not allege that Officers Johnson or Thomas were involved in his formal arrest. Therefore, their motion for summary judgment is granted.

### ii.    Malicious Prosecution

"The elements of a cause of action for malicious prosecution are: (1) a criminal prosecution instituted against plaintiff by defendant, terminating in plaintiff's favor, (2) absence of probable cause for the criminal proceeding, and (3) malice or a primary purpose in bringing the action other than bringing the offender to justice."  *Rivers v. Ex-Cell-O Corp*, 100 Mich. App. 824, 832 (1981).  "[T]he only situation in which an

26

action for malicious prosecution would properly lie is where a police officer knowingly swears to false facts in a complaint, without which there is no probable cause." *Payton v City of Detroit*, 211 Mich. App. 375, 395 (1995)(*quoting King v. Arbic*, 159 Mich. App. 452, 466 (1987)).  The mere "failure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution." *Id.*

Plaintiff asserts that Officer Jimenez "conspired with [O]fficers Davis and Thomas to fabricate evidence and mislead the prosecution and courts."  Pl. br. at p. 27.  The Court presumes that this claim is not asserted against Officer Johnson, since no specific allegations are made against him.  And, Officer Davis is not a named Defendant. Therefore, the Court only considers this claim against Officers Thomas and Jimenez.

First, there is no evidence to support Plaintiff's claim against Officer Thomas. Plaintiff does not specify the manner in which Thomas conspired with Jimenez.  Nor does Plaintiff identify other alleged acts by Thomas which led to his wrongful prosecution.  Plaintiff only alleges in his brief that Officer Thomas prepared a false report claiming that Plaintiff confessed to firing a weapon on the evening of the fireworks (in another area of the city and at a different time).  *See* Pl. Exh. L.  However, this alleged confession was not included in Jimenez's Report, and it was not presented at the preliminary examination.  Further, there is no evidence that the prosecution was aware of the report or relied upon it in making the charging decision.  Therefore, Officer Thomas is entitled to summary judgment on this claim.

Second, for the reasons already stated, there is a question of fact regarding whether there was probable cause for the arrest warrant issued against Plaintiff.  As

27

Defendant Jimenez executed the affidavit upon which the arrest warrant was based, his motion for summary judgment is denied.

### D.     Municipal Liability

Plaintiff asserts that the City of Detroit is liable under §1983 for failure to train and supervise its officers.  "To prevail in a §1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom."  *Thomas v City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005), *cert. den.,* 126 S. Ct. 338 (2005)(*citing Monell v Dep't of Social Services*, 436 U.S. 658, 694 (1978)).  "[T]he inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Canton v Harris*,  489 US 378, 388 (1989). Liability can be found where, considering the duties assigned to specific officers, "the need for more training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id* at 390.  The allegedly inadequate training must represent a "city policy" and it must actually cause injury.  *Id.*

Here, Plaintiff alleges that the City of Detroit had a custom, policy or practice of: 1) "not engaging in any systematic supervision or review of detectives or their investigations," and 2) "allowing detectives to investigate crimes, make arrests, prepare reports and handle evidence without appropriate supervision."  Pl. br. at pp. 5, 29.  As a result, Plaintiff alleges that he was wrongfully arrested and detained for over 100 days.

There is a question of fact which precludes summary judgment with regard to

28

both Plaintiff's initial detention and formal arrest.  As stated, there is evidence that Plaintiff was forcibly detained without his consent and taken to the station for an investigation.  It is undisputed that Officer Johnson did not have probable cause or a warrant which authorized Plaintiff's initial detention.  It is also undisputed that, during Plaintiff's allegedly unlawful detention, incriminating evidence was gathered against him which was used to obtain an arrest warrant.  Lastly, there is evidence that, as late as January 18, 2005, the City was not in full compliance with the Consent Judgments entered prior to the incidents giving rise to this claim.  The Consent Judgments required that the DPD: 1) "revise its arrest policies to define arrest and probable cause" in accordance with the Judgments; 2) review the merits of all arrests within a certain time after the arrest to ensure that there was probable cause to support it; and 3) provide annual training to officers on arrests which addresses, among other things, the Fourth Amendment's requirements.  Pl. Exh. H at pp. 17-19, 66.

Construing this evidence in a light most favorable to Plaintiff, reasonable jurors could infer that the imposition of the Consent Judgments put the City on notice of an inadequacy in its training and supervision of officers in arrest procedures, and that this inadequacy resulted from City custom, policies or practices.  Reasonable jurors could also infer that the City was deliberately indifferent to the need to revise its policies based on evidence that the Judgments were entered in July 2003, but the City had not made the necessary revisions as of June 24, 2004.  And, if it is determined that Plaintiff's initial detention was an unlawful arrest, he can establish that he was injured by the City's alleged policies since he was detained for a number of hours, subjected to a show-up and line-up, and formally arrested, charged and held for over 100 days based

upon evidence gathered during his detention.  Therefore, the City of Detroit's motion for summary judgment is denied.

## VII.    CONCLUSION

Defendants' Motion for Summary Judgment is **GRANTED** in its entirety in favor of all parties except Defendants A. Johnson, Jimenez and the City of Detroit.

Defendant **A. Johnson's** motion is **GRANTED IN PART AND DENIED IN PART**. The claims that will continue against this Defendant pertain to Plaintiff's initial detention only: 1) false arrest and imprisonment (Counts I and II), 2) malicious prosecution (Count VI), and 3) violation of 42 U.S.C. §1983 (Count VII).

Defendant **Jimenez's** motion is **GRANTED IN PART AND DENIED IN PART**. The claims that will continue against this Defendant pertain to Plaintiff's formal arrest only: 1) false arrest and imprisonment (Counts I and II), 2) malicious prosecution (Count VI), and 3) violation of 42 U.S.C. §1983 (Count VII).

Defendant **City of Detroit's** motion is **GRANTED IN PART AND DENIED IN PART**.  The claim that remains against the City pertains to Plaintiff's initial detention and formal arrest only: municipal liability (Count X).

Plaintiff is directed to amend his Complaint to properly allege a Fourth Amendment unlawful arrest violation of §1983.  The Amended Complaint must incorporate the counts which remain after this Order is entered.  It must have separate counts for each remaining Defendant.  It must also have separate counts for each false arrest and imprisonment.  For example, Plaintiff must have separate false arrest counts

as they pertain to A. Johnson and Jimenez.  The same would be true for the false imprisonment and malicious prosecution counts, and the §1983 counts.

The boilerplate, superfluous and redundant paragraphs in the original Complaint must not be included in the Amended Complaint.

An Amended Complaint must be filed within 14 days of this Order.

**IT IS SO ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 29, 2006

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 29, 2006.


s/Linda Vertriest
Deputy Clerk

31